[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant, whose maiden name was Denise Barr, and who was married to the plaintiff under the name of Denise Barr Koplon, and the plaintiff, were married at Warren, Connecticut, on June 21, 1986. The plaintiff has lived in Connecticut since 1977 for at least twelve (12) months next preceding the date of the filing of the complaint. Each of the parties has been married previously. Neither of the parties had any children as a result of the earlier marriages. No children were born as issue of this marriage.
The husband is fifty (50) years old. He graduated from Penn State University and got an MBA from Columbia University in 1968. He then went into marketing management with Proctor and Gamble. He was responsible for sales and profits, ending up as marketing manager for Folger's instant coffee for the United States. In 1972, he went to work for Glendenning Associates, a marketing consulting firm in Westport, Connecticut. He was chiefly involved in Clairol hair coloring. He remained there six years at which time he went into his own business as a consultant. He ran this business out of his home in Redding and an office in New York. He has been in the business with varying degrees of prosperity since that time. At one time, he grossed as much as two hundred fifty thousand ($250,000) dollars a year. This consulting business has dwindled down with the exception of one good year in 1991. In 1993, the business only grossed sixty thousand ($60,000) dollars and he showed no net income for tax purposes. The plaintiff has closed the New York office.
Mr. Olewine is a member of a long established family in Harrisburg, Pennsylvania, where they ran a successful food distribution business. The family sold the business in 1988 and it is now a subsidiary of a larger corporation.
The parties met in 1980. They lived together for the six CT Page 5440 years prior to the marriage except for a time in the middle of this period when they broke up. When they started keeping company, each had an apartment in New York City. The Connecticut house was being renovated but was not ready for the two of them to occupy when they got married. They continued with the dual residences in New York. Mrs. Olewine never did come up to live in Connecticut, even after the newly renovated house was ready on Labor Day, 1987. The logistics of their relationship were most unusual, to say the least. The parties never lived together in either of the apartments either before or after the marriage. She rarely visited his apartment. He didn't move his things into her place. In the first year of the marriage, he stayed at her place from fifty to sixty times. Personal relationships were poor. Mrs. Olewine just didn't want to be with him. He was just sort of closed out of her life. There was a general lack of love, affection and physical intimacy.
In the summer of 1985, they had consulted a psychiatrist, Dr. Donald Klein, and his wife, a psychotherapist, Dr. Rachel Klein. Mr. Olewine was concerned about his wife's hostility towards him. They recommended Norpramine which helped tremendously, so that things went very well. Dr. Rachel Klein saw Mrs. Olewine frequently for depression, among other complaints.
Mr. Olewine felt that Mrs. Olewine could work but she had quit her full-time job as a librarian at the Dalton School and claimed that she could only do part-time work at best. Mr. Olewine felt that, although her pay would not be significant in view of his wealth, it was important for her to be active and get something out of life.
Mr. Olewine has paid directly to Mrs. Olewine or on her behalf for things like medical care, educational programs, and the like, about fifty thousand ($50,000) dollars a year, since they separated in 1989. This means that he has voluntarily paid her about three hundred eighty-five thousand ($385,000) dollars without a court order and therefore not deductible to him.
The plaintiff's testimony about his finances tracks his affidavit of February 23, 1994. He shows zero net income from employment and two hundred fifty-one ($251) dollars a week income from other sources. He claims seven thousand three hundred four ($7,304) dollars per month living expenses. His claim is that since he feels he should pay only lump sum alimony and not periodic alimony, he does not rely on income deficiency as a CT Page 5441 factor in the award to be made. With this position, the court substantially agrees. He claims that the Redding property is worth five hundred thousand ($500,000) dollars with two hundred eighty-nine thousand ($289,000) dollars equity if certain repairs are made. He values a jointly owned adobe house in Carefree, Arizona, at three hundred fifteen thousand ($315,000) dollars, claiming the full value as his own, since he has been in all respects the equitable owner of Mrs. Olewine's half interest.
He has two hundred six thousand ($206,000) dollars in cash savings and four hundred sixty-four thousand ($464,000) dollars in stocks. His pensions, profit sharing, IRA and 401K's total three hundred twenty-nine thousand ($329,000) dollars. His other miscellaneous assets total three hundred seventeen thousand ($317,000) dollars. He shows his total assets as one million nine hundred eighty-seven thousand six hundred seventy-one ($1,987,671) dollars. The court found him to be a very honorable and straightforward witness and accepts this figure. He had been worth two million seven hundred thousand ($2,700,000) dollars but he lost much money in over-improvements in the Redding house and in his own living and support of Mrs. Olewine as his net income slid to zero a year.
Mrs. Olewine's affidavit is very sparse. She shows no income other than approximately one thousand ($1,000) dollars a week paid by her husband. She shows total weekly expenses of one thousand fifty-one ($1,051) dollars. The affidavit is done informally in ink and deserves a close look. The items under weekly expenses are as follows:
 Rent $253.25 Electric 21.00 Telephone 62.00 Cable TV 7.00 Food 150.00 Clothing 200.00 Repairs tip 30.00 Transportation 40.00 Medical/Dental 224.14 Not included by court since a note says "Paid by husband." Cleaners 30.00 Animal care 40.00 Not included by court since a note says "Paid by husband." _______ Actual Expense $763.25 CT Page 5442
Thus, the court is faced with an affidavit which is inflated on its face. In addition, in view of Mrs. Olewine's low-horsepower existence, the figures of one hundred fifty ($150) dollars a week for food and two hundred ($200) dollars a week for clothing look high.
An example of the carelessness with which Mrs. Olewine's affidavit of March 3, 1994 was composed is shown in the computation of the total cash value of all assets at twenty-six thousand four hundred twelve ($26,412). This reflects only the inked-in total value of her deferred compensation plans. It fails to include in the total the following bank accounts shown on the affidavit:
 Chemical Bank Checking $ 200.00 Chemical Bank Savings 9,903.86 American Savings Bank CB 16,103.86 ---------- Total $26,207.72
Adding this figure to the twenty-six thousand four hundred twelve ($26,412) dollar figure previously commented on gives a corrected figure of fifty-two thousand six hundred nineteen dollars and seventy-two ($52,619.72) cents.
In March of 1986, Mr. Olewine contracted for a luxury residence in Arizona in his own name. At closing, in response to legal advice, Mr. Olewine put the property in the joint names of him and his wife, Denise. He did not intend to make a gift to her. The parties agree that the property was worth about three hundred fifteen thousand ($315,000) dollars. Mr. Olewine has paid off the mortgage. The house is at an elite condominium resort and is regularly rented out. It nets Mr. Olewine about twenty-five to thirty-five thousand ($25,000 — $30,000) dollars a year. He holds it primarily as an investment and to use on vacations and retirement.
Mr. Olewine paid three hundred thirty-five thousand ($335,000) dollars for the house. Mrs. Olewine contributed nothing. The last time she was at the property was in March, 1988. Mr. Olewine paid the entire purchase price of the house, collected all the rents, paid all of the charges and totally and completely managed the property with no input from his wife. Although she stated, unconvincingly, that her husband told her he CT Page 5443 was making a gift of the one-half interest to her, the overwhelming weight of the evidence is that Mr. Olewine was the equitable owner of Mrs. Olewine's one-half interest, and the court so concludes.
Mrs. Denise Olewine is forty-seven (47) years old and in generally good physical condition, except as her daily functioning may be affected by her long-standing psychological and characterological problems. She now resides in an apartment at 345 E. 80th Street in New York City where she has long lived. She graduated from Boston University in 1969. For four years she was a teacher in Caldwell, New Jersey. For three or four years thereafter, she did office temp jobs in Manhattan until she got married in 1976. After her marriage, she continued to do office temp jobs and in 1978 started as an assistant at the Dalton School. She got divorced in 1982. She started teaching at Dalton and later became a librarian. She functioned adequately in both jobs. She ceased working at Dalton in 1988 and hasn't worked since.
Denise Olewine has long-standing psychological impediments which presently present her as a reclusive, uncertain and dysfunctional person. The basic pattern of her inability to face life and make use of her education and natural attributes was well established when the parties met. Mr. Olewine insists that things were pretty good in the middle of their living together unmarried, but got progressively worse after the marriage. The court credits his sincerity but is very doubtful of this claim. At best, she got worse in a matter of degree and is presently at the bottom of her cycle of dependency and depression. She is a nervous, anxious person with extensively low self-esteem. She has taken thirty courses, seminars, extension programs and the like at Mr. Olewine's expense, but has failed to benefit substantially from any of them. She looked for employment only by casual notice of ads in the New York Times. She currently has no interest in teaching or library work. It is fair to say that at that present time, Denise Olewine just barely exists. She doesn't reach out personally or professionally. She is completely wrapped up in herself and her problems. Ironically, it is Mr. Olewine's generous and honorable furnishing of fifty thousand ($50,000) dollars a year, not as taxable alimony, that has helped her slide into the dependent cocoon from which she rarely emerges.
Donald F. Klein, M.D., is a very distinguished board-certified CT Page 5444 psychiatrist and clinical pharmacologist whose principal role is as a professor of psychiatry at Columbia. His curriculum vitae of training, positions held, honors received, and articles written solely or with others consists of sixty-seven (67) pages. His subspecialty is psychopharmacology, which is the study and practice of using various psychotropic agents for the treatment of patients with mental and medical disorders. He first saw Denise Olewine in July, 1985. Her main complaints concerned the pressures she was under, mood swings, premenstrual syndrome and, since childhood, tremendous social anxiety. He found her to be very anxious and dependent. She felt no one liked her. She was dependent on sedatives. He concluded that she was a borderline complex labile dependent anxious personality. He had some small success treating Mrs. Olewine with somewhat improved mood and less depression. He was utterly unsuccessful with an attempt to get her to take more responsibility for her life and to get her to overcome her social anxieties so that she could take care of herself. He prescribed a continuing course of medication with moderate results. She was taking a cornucopia of anti-depressants to relieve her anxiety and instability. While he was seeing her, she was also being treated by his wife, Dr. Rachel Klein.
At his deposition on February 15, 1993, he felt that her condition was not such that she couldn't attempt to work. She was most recently on Sulperide, an antidepressant not approved by the FDA, but he and Dr. Rachel Klein have still been unsuccessful in trying to get her "mobilized." His final diagnosis as of that date: panic disorder in remission; sedative dependence in remission; not as depressed; still maintains an extraordinarily high level of narcissistic concern and social phobia. The latter is not a personality disorder. It consists of people who are extraordinarily apprehensive in their interpersonal contact, that then may be reviewed in a critical way.
Dr. Rachel Klein is a professor of clinical psychiatry at Columbia with a Ph.D. in clinical psychology. She also has a distinguished curriculum vitae of eighteen pages. She first saw Mrs. Olewine in 1985, referred by her husband. Dr. Klein was also deposed on February 15. She found Mrs. Olewine depressed, anxious, having interpersonal problems, and lacking motivation in her work and her relationships. The treatment with anti-depressants was quite successful. The total visits to the date of deposition were one hundred twenty-eight (128). She got worse about six months after the marriage, becoming irritable. She was CT Page 5445 put on various anti-depressants over a period of time but did not attain the original improvement she had before the marriage. At the time of the deposition, she was on four medications. The diagnosis was then acute social phobia with a narcissistic personality disorder. She had done quite well at work from 1985 on but stopped work in 1988.
Dr. Klein felt it was a mistake for her to stop work. She is intellectually able to work but paralyzed by anxiety. There is no medical reason why she can't work and Dr. Klein recommended to her that she seek employment. She, however, after quitting her job at Dalton, did not want to go out and face the world and seek work. Dr. Klein feels she has failed to get Mrs. Olewine to take control of her life. Mrs. Olewine should make progress if she pushes herself and ventures out. Mr. Olewine was cooperative in dealing with his wife's condition and Dr. Klein thought perhaps he should have been less accommodating. About all that she does for herself is shopping. The only real hope for the future is medications, not psychotherapy. Frankly, the less she exposes herself, the more acute the social anxiety becomes.
Neither Dr. Klein nor Dr. Donald Klein claimed that Mrs. Olewine is or has been mentally ill nor was any reference made to the classification of her syndrome in the Diagnostic and Statistical Manual of Mental Disorders.
The court finds that the marriage has broken down irretrievably. The marriage is dissolved on the basis of irretrievable breakdown. In forming the financial orders, the court has given very careful consideration to the statutory criteria as follows:
 Sec. 46b-81. (Formerly Sec. 46-51). Assignment of property and transfer of title.
 (c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. CT Page 5446
Section 46b-82 (Alimony) provides:
 Sec. 46b-82. (Formerly Sec. 46-52). Alimony. At the time of entering the decree, the superior court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81. . . .
The court would note three differences in these statutes: (a) section 46b-81 includes language concerning the opportunity of each for future acquisition of capital assets and income, which language is not found in section 46b-82; (b)section 46b-81 refers to the "estate, liabilities, and needs of each of the parties" while section 46b-82 speaks only of the "estate and needs of each of the parties"; and (c) section 46b-82 provides, of major significance in this case, that in considering alimony the court may consider the award, if any, which the court may make pursuant to section 46b-81.
The defendant claims alimony for life, death of either party, or remarriage of the defendant, plus one-half the enhancement or increase of value in the parties' assets since the marriage. There has been no such enhancement. The defendant's claims are far from the mark. The plaintiff would pay no alimony but give lump sum alimony as follows:
 1. $50,000 forthwith 2. 2,000 a month for 6 months 3. 1,500 a month for 6 months 4. 1,000 a month for 6 months $77,000 lump sum alimony
The plaintiff's offer, although not irresponsible in view of all he has done for the defendant, falls somewhat short of fairness and equity but is much closer to a just solution than is the defendant.
I CT Page 5447
ASSIGNMENT OF PROPERTY AND TRANSFER OF TITLE
A. The defendant is ordered to transfer to the plaintiff all of her right, title and interest in the property in Carefree, Arizona, and the plaintiff is ordered to hold her harmless from all liability whatsoever in connection with that property.
B. The key to the financial orders in this case is the necessity of awarding the plaintiff some reasonable measure of capital to give a firm underpinning to her future efforts to fly solo for a change, i.e., to terminate her self-destructive super-dependency which feeds on itself and is a sinkhole of inactivity unless she herself decides to do something about it. This award of assets must be made in the light of her relinquishment of her one hundred fifty thousand ($150,000) dollars plus one-half interest in the Arizona property. The statutory criteria with the court's conclusions follows:
1. The length of the marriage is eight years, but only four together; a second marriage for both.
2. Cause for the dissolution. Almost entirely caused by defendant's social hostility, irritability and failure to function as a marriage partner or partake to any major degree in life's activities. The plaintiff was kind, generous and loving to a fault, but his wife's conduct finally became unbearable.
3. As noted, plaintiff is fifty (50), defendant is forty-seven (47); each in good physical health — she is subject to limitations of personality that so far have mostly resisted efforts of two top-notch professionals.
4. Station and occupation. She is an ultra-dependent former teacher and librarian who has not shown any interest in employment while the plaintiff has given her fifty thousand ($50,000) dollars a year in non-taxable gifts on which to live. He is a wealthy, experienced professional whose recent business income has dwindled to zero.
5. Plaintiff's income is substantial, coming at this time from his assets of about two million ($2,000,000) dollars. Defendant's income from her own assets is very limited and largely consists of the payments made by the plaintiff in the last three and one-half years. CT Page 5448
6. Vocational skills and employability. Plaintiff has advanced education and experience as a marketing consultant. It is not necessary for him to work, however, because of his wealth. The defendant is a certified teacher and experienced school librarian who has not worked in some years because (a) her husband has carried her along lavishly; and (b) her psychological inhibitions which have made her not willing to try to go to work. Most importantly in this opinion, the court concludes that the defendant can work if she wills to do it. This conclusion is based not only on careful observation of the defendant during the trial but also particularly on the anguished testimony of Dr. Rachel Klein, whose deposition shows clearly a caring professional who saw the defendant one hundred twenty-eight (128) times at the date of the deposition, running out of patience at the defendant's lack of effort to take charge of her own destiny.
7. Estate, liabilities and needs of each of the parties. These items are shown on the affidavits. The defendant does not need the amount now given by the plaintiff, according to her own affidavit. There is no need for her to continue living in a Manhattan apartment at one thousand ($1,000) dollars plus a month rent, with a private trainer at the gym, and attending no less than thirty (30) different educational and cultural enhancement programs, all at the expense of the plaintiff.
8. Opportunity of each for future acquisition of capitalassets and income. The plaintiff has a good opportunity of adding to his assets and returning to gainful employment. The defendant has a negligible opportunity of acquiring more capital assets but a strong opportunity of gainful employment if she wills it to get "mobilized" as her professionals put it. Each party contributed solely to the acquisition preservation or appreciation of their respective estates, except that his large support payments for three and one-half years probably contributed to her cash assets and depleted his.
In view of all of the above, the plaintiff is ordered to pay to the defendant as lump-sum alimony the sum of two hundred thousand ($200,000) dollars, payable as follows:
 a) $100,000 forthwith b) 100,000 12 months from this date
II CT Page 5449
ALIMONY
In lieu of the criteria in section 46b-82 already commented upon in connection with section 46b-81, and particularly in reliance on the assignment of property ordered above, the court concludes that there is no award of periodic alimony to the defendant. It should be added that even were it to be determined that periodical alimony is justified, the plaintiff has more than met any potential liability in this regard by the very large tax free amounts he has given her since the separation.
 III
The plaintiff is ordered to provide and pay for reasonably necessary medical coverage, equivalent at least to what he has done in the past for the defendant, for a period of three years. In view of her history, such coverage shall include psychiatric and psychological treatment and consultation.
 IV
The defendant moved at close of trial for an award of counsel fees. Counsel was ordered to file the usual affidavit of time and charges and agreed to do so. Counsel's affidavit of April 28, 1994 regarding counsel fees was stamped into the court on May 12, 1994 after this opinion was drafted. This necessitated a slight amendment of the opinion and is an imposition on the court. Counsel's affidavit points out the broad experience he has had in the field of matrimonial law, including lectureships at several professional meetings and authorship of two substantial articles on the subject. Counsel claims 52.40 hours of work with a charge for his services of three hundred fifty ($350) dollars an hour, two hundred fifty ($250) dollars an hour for associate's time and ninety-five ($95) dollars an hour for paralegal's time. The court concludes that the fees charged are excessive by the standards of family law practice in this court. The court is therefore unwilling to award in full the balance claimed to be due from the defendant of twenty-two thousand nine hundred eight dollars and fifty ($22,908.50) cents. As part of the mosaic of this overall apportionment of the party's assets, the plaintiff is ordered to pay to the defendant the sum of ten thousand ($10,000) dollars on account of her attorney's fees.
T. Clark Hull CT Page 5450 State Trial Referee